| | | |
|---|---|---|
| JOHN W. FISHBACK, III<br>30420 Revells Neck Road<br>Westover, Maryland 21890 | * | IN THE   21 NOV 23 AM 10: 32 |
| | * | |
| Plaintiff | * | |
| v. | * | CIRCUIT COURT |
| STATE OF MARYLAND<br>80 Calvert Street<br>Annapolis, Maryland 21401<br>SERVE UPON:<br>   Brian Frosh, Attorney General<br>   Office of the Attorney General<br>   200 Saint Paul Place<br>   Baltimore, Maryland 21202 | *<br><br>*<br><br>*<br>*<br>* | FOR |
| *and* | * | ALLEGANY COUNTY |
| Nancy K. Kopp, Treasurer<br>Louis L. Goldstein Treasury Building<br>80 Calvert Street, Room 109<br>Annapolis, Maryland 21401 | *<br><br>* | |
| and | * | |
| MARYLAND DEPARTMENT OF PUBLIC<br>SAFETY AND CORRECTIONAL<br>SERVICES<br>300 East Joppa Road<br>Towson, Maryland 21286<br>SERVE UPON:<br>   Brian Frosh, Attorney General<br>   Office of the Attorney General<br>   200 Saint Paul Place<br>   Baltimore, Maryland 21202 | *<br><br>*<br><br>*<br><br>*<br><br>* | |
| *and* | * | Case No.: |
| Nancy K. Kopp, Treasurer<br>Louis L. Goldstein Treasury Bldg.<br>80 Calvert Street, Room 109<br>Annapolis, Maryland 21401 | *<br><br>* | |
| and | * | |

| | |
|---|---|
| RICHARD R. GRAHAM, JR.<br>308 King James Court<br>Upper Marlboro, Maryland 20774 | *<br><br>* |
| and | * |
| CURRAN MCKENZIE<br>120 Park Avenue<br>Cumberland, Maryland 21502 | *<br><br>* |
| Defendants | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT AND PRAYER FOR JURY TRIAL

Plaintiff, John W. Fishback, III, through his undersigned counsel, submits this Complaint and Demand for Jury Trial against the Defendants, State of Maryland, Maryland Department of Public Safety and Correctional Services, Richard R. Graham, Jr. and Curran McKenzie, and states in support:

### PARTIES

1. Plaintiff John W. Fishback, III ("Plaintiff" or "Mr. Fishback") resides at the Eastern Correctional Institution ("ECI"), 30420 Revells Neck Road, Westover, Maryland 21890, and brings this action with respect to injuries that he sustained in an attack that occurred on September 6, 2018 at the Western Correctional Institution ("WCI"), which is located at 13800 McMullen Highway, S.W., Cumberland, Maryland 21502.

2. Defendant Maryland Department of Public Safety and Correctional Services ("DPSCS") at all relevant times, through its departmental administrative entities and its agents, servants, and employees, operated and oversaw WCI.

3. Defendant State of Maryland (the "State"), at all relevant times, through its departmental administrative entities and its agents, servants, and employees, operated and oversaw DPSCS and WCI.

-2-

4. Defendant Richard Graham, Jr., at all relevant times, was the Warden at WCI and an employee of the State and DPSCS.

5. On information and belief, Defendant Curran McKenzie, at all relevant times, was an employee of the State and DPSCS and was responsible for the safety and security of Housing Unit 2 at WCI where Plaintiff's assailants were housed on the morning of the subject attack.

6. All Defendants acted under color of state law at all relevant times.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this matter, pursuant to Maryland Code, Courts & Judicial Proceedings ("CJP") §§ 1-501 and 4-401, as the amount in controversy in this case exceeds Thirty Thousand Dollars ($30,000.00).

8. This Court has jurisdiction over the Defendant pursuant to Maryland Code, State Gov't ("SG") § 12-106 and CJP § 6-103.

9. Venue is proper in this Court pursuant to CJP § 6-201, because all relevant events and omissions occurred at WCI, which is located in Allegany County, Maryland.

10. Mr. Fishback has complied with the Maryland Tort Claims Act ("MTCA"), SG § 12-106(b) by sending a written notice to the Maryland State Treasurer by certified mail, return receipt requested, on or about January 9, 2019 (Claim No. 01MD19TG0562).

11. The Treasurer denied Mr. Fishback's claim on or about September 21, 2020.

## FACTS COMMON TO ALL COUNTS

12. On the morning of September 6, 2018 at WCI, a prisoner viciously attacked and stabbed Mr. Fishback as he waited in line to receive his morning medication from the Medication Shack, which is on the open-air compound at WCI.

13. The assailant used an eight (8) inch homemade knife tied around his right wrist to carry out the attack. A true and correct photograph of the knife used in the attack is attached as **EXHIBIT 1**.

14. On information and belief, the assailant resided in Housing Unit 2 on the morning of the attack.

15. On information and belief, at all relevant times, DPSCS and WCI regulations required closed circuit security cameras to be operational and monitored in each housing unit at WCI.

16. On information and belief, at all relevant times, DPSCS and WCI regulations required there to be a metal detector at the entrance/exit to each housing unit at WCI.

17. On information and belief, at all relevant times, there were no working security cameras in Housing Unit 2.

18. On information and belief, at all relevant times, there was no metal detector securing Housing Unit 2's entrance and exit.

19. On information and belief, Mr. Fishback's assailant was a member of the Security Threat Group "MS-13"—a brutal gang with a large presence at WCI and throughout the Maryland prison facilities.[1]

20. On information and belief, the assailant had previously attacked other prisoners and WCI staff knew the assailant to be a violent, high-risk prisoner.

---

[1] MS-13 is a national and transnational gang composed primarily of immigrants or descendants from El Salvador. Branches or "cliques" of MS-13, one of the largest street gangs in the United States, operate throughout Maryland, Virginia, and throughout the United States. Members of MS-13 are expected to protect the name, reputation, and status of the gang from rival gang members and other persons. To protect the gang and to enhance its reputation, MS-13 members are expected to use any means necessary to force respect from those who showed disrespect, including acts of intimidation and violence. MS-13 members are required to commit acts of violence to maintain membership and discipline within the gang. One of the principal rules of MS-13 is that its members must attack and kill rivals, known as "chavalas," whenever possible. Another principal rule of MS-13 is that its members must never cooperate with law enforcement. Violation of this rule results in an order of death for the offender.

21. On information and belief, Mr. Fishback's assailant was classified as a maximum security prisoner on the day of the attack.

22. On information and belief, at all relevant times, WCI prisoners classified as maximum security could only leave their housing unit with a pre-approved institutional "Pass," which grants the prisoner permission to travel from the housing unit to a specified location, for a specific purpose, at a specific time.

23. On information and belief, at all relevant times, DPSCS and WCI governing regulations required WCI maximum security prisoners with an institutional Pass to "check out" with the housing unit officer in order to leave the housing unit and travel to the location authorized by the Pass. This "check out" process required the housing unit officer to document and record the maximum security prisoner's movement from the housing unit to the pre-approved Pass location, and it also required the housing unit officer to pat down and/or search the maximum security prisoner before he left the housing unit.

24. On information and belief, at all relevant times, Defendant McKenzie was the housing unit officer in charge of Housing Unit 2 at WCI.

25. On information and belief, Mr. Fishback's assailant received a Pass to attend a medical appointment at WCI on the morning of September 6, 2018, at 8:30 a.m.

26. On information and belief, Mr. Fishback's assailant had to walk from Housing Unit 2 through the open yard at WCI to get to the medical appointment in the Infirmary.

27. At all relevant times, the WCI Infirmary was approximately 200 feet past the Medication Shack where Mr. Fishback waited in line for his medication on the morning of September 6, 2018.

28. On information and belief, Mr. Fishback's assailant wore jeans and a short-sleeved shirt on the morning of September 6, 2018. Attached as **EXHIBIT 2** is the inventory and chain of custody log for the assailant's clothing on the morning of the attack.

29. On information and belief, Mr. Fishback's assailant secured an eight (8) inch homemade knife to his right wrist with tape and a shoelace on the morning of September 6, 2018.

30. On information and belief, on the morning of September 6, 2018, Mr. Fishback's assailant walked from his cell in Housing Unit 2 through the main exit of the housing unit, which Defendant McKenzie was guarding and/or responsible for securing.

31. On information and belief, Mr. Fishback's assailant was not searched, patted down, or otherwise checked before he was allowed to exit Housing Unit 2 and proceed onto the main WCI compound on the morning of September 6, 2018.

32. Had Defendant McKenzie, or the correctional officer(s) under his direct control, properly followed the governing regulations concerning maximum security prisoner movement as previously described, Mr. Fishback's assailant would not have made it out of Housing Unit 2 with the deadly weapon affixed to his right hand.

33. Defendant McKenzie and/or the correctional officer(s) under his direct control failed to follow the governing regulations, failed to pat down or otherwise search Mr. Fishback's assailant, and failed to ensure the safety and security of the prisoners and staff at WCI.

34. Once Mr. Fishback's assailant exited Housing Unit 2 on the morning of September 6, 2018, he proceeded to the medication line where Mr. Fishback waited and repeatedly stabbed Mr. Fishback in the neck.

35. Mr. Fishback sustained life-threatening injuries, including but not limited to, a severed left vertebral artery, a large perfused pseudoaneurysm, a focal peripheral clot in the left verterbral artery, distal thrombus, and photopsias. A true and correct photograph of Mr. Fishback's neck injury is attached as **EXHIBIT 3**.

36. Mr. Fishback's injuries were so severe that he was flown by Medivac helicopter from WCI to Shock Trauma at the University of Maryland Medical Center where he remained in intensive care from September 6 until September 13, 2018.

37. Although emergency responders intubated Mr. Fishback during his Medivac flight, Mr. Fishback remained fully conscious and awake. He could hear and feel everything going on around him, and lay in sheer terror believing that he was going to die as he felt the blood pouring out of his neck.

38. Mr. Fishback remained intubated from September 6 through September 8, 2018, due to the severity of his injuries.

39. At Shock Trauma, Mr. Fishback underwent several surgeries to his neck due to repeated complications. These surgeries included embolization of the left vertebral artery with sixteen (16) coils and gel foam, and embolization of traumatic cervical arteriovenous fistula.

40. While Mr. Fishback remained at the Shock Trauma intensive care unit, DPSCS and/or WCI personnel packed up and either lost or destroyed the personal property in Mr. Fishback's cell. DPSCS and/or WCI staff failed to inventory Mr. Fishback's personal property as required by governing regulations, and failed to return this property to Mr. Fishback after his discharge from Shock Trauma.

41. At the time of his discharge from Shock Trauma on September 13, 2018, Mr. Fishback had lost significant feeling on the left side of his neck, face, and head, which persists to this day.

42. On September 13, 2018, Shock Trauma discharged Mr. Fishback back to the custody of DPSCS.

43. Upon discharge, Shock Trauma provided DPSCS with specific discharge orders that were medically necessary to ensure that Mr. Fishback received the requisite post-surgery follow-up care.

44. Shock Trauma's discharge orders to DPSCS included, but were not limited to, scheduling a follow-up with the neurosurgery team within two (2) weeks, obtaining and dispensing five (5) prescription medications, and scheduling follow-up visits with an ophthalmologist and an orthopedist as soon as possible.

45. DPSCS, the State, and Defendant Graham failed to follow any of Shock Trauma's discharge orders after Mr. Fishback's discharge.

46. DPSCS, the State, and Defendant Graham failed to provide any follow-up medical care to Mr. Fishback after he returned to WCI from Shock Trauma, and thus caused Mr. Fishback to lay in pain and terror every day.

47. DPSCS and WCI ultimately scheduled Mr. Fishback's follow-up appointment with the Shock Trauma neurosurgery team for November 13, 2018.

48. At Mr. Fishback's neurosurgery follow-up on November 13, 2018, the physician noted an enlarging mass in Mr. Fishback's neck at the injury site, and left arm weakness with no improvement since the surgery. The physician referred Mr. Fishback to an orthopedic surgeon for further evaluation, ordered a nerve conduction study of Mr. Fishback's persisting neck and arm symptoms, and recommended that Mr. Fishback begin a new prescription medication for his nerve pain. The physician gave these discharge orders to DPSCS and WCI.

49. DPSCS and WCI failed to schedule an appointment with an orthopedic surgeon and also failed to provide Mr. Fishback with the nerve pain medication as ordered by the Shock Trauma neurosurgery team.

50. DPSCS and WCI similarly failed to schedule Mr. Fishback for a nerve conduction study for several months, and ultimately scheduled that consultation on March 13, 2019 — more than six months after the attack.

51. Mr. Fishback needlessly suffered because DPSCS and WCI refused or otherwise failed to implement the Shock Trauma discharge orders in both September and November 2018.

52. Mr. Fishback now suffers permanent loss of feeling on the left side of his neck, face, and head, with reduced strength and range of motion in his left arm and hand.

53. On information and belief, the attack on Mr. Fishback was the most recent in a string of several similar prisoner-on-prisoner attacks at WCI between 2015 and 2018. Several of these previous attacks occurred because of protocol failures and deficient facility security (i.e. no cameras, no metal detectors, and improper documentation of prisoner movement), as was the case with the attack on Mr. Fishback.

54. On further information and belief, at all relevant times, WCI, DPSCS, the State, and Defendant Graham had personal knowledge of the previous prisoner-on-prisoners attacks and failed to implement safety and security measures that were both necessary for the safety of prisoners and staff at ECI, and that were recommended and/or required by the State vis-à-vis corrective action plans and/or quality assurance reviews.

55. On further information and belief, many of the previous prisoner-on-prisoner attacks at WCI involved maximum security assailants who were improperly secured, guarded, searched, and/or separated from the general population. These security failures by WCI/DPSCS/State personnel created a risk of serious injury to all prisoners and staff at WCI.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence
### (Against All Defendants)

56. The previous paragraphs incorporated as if fully set forth herein.

57. Each Defendant owed a duty of reasonable care to Mr. Fishback arising out of their special relationship with him to protect him from unreasonable risk of harm.

58. Defendants breached this duty to Mr. Fishback, as described herein, when they failed to implement and follow the governing regulations and protocols concerning, *inter alia*, prisoner safety, prisoner movement, and housing unit security, which failures allowed Mr. Fishback's assailant to walk out of Housing Unit 2 with an eight (8) inch knife strapped to his wrist — in plain view.

59. Defendant McKenzie breached his duty to Mr. Fishback when he failed to secure Housing Unit 2 on the morning of the subject attack, and when he failed to ensure that Mr. Fishback's assailant did not leave Housing Unit 2 with a deadly weapon in plain view.

60. Defendants DPSCS and the State further breached their duty to Mr. Fishback when they failed to follow and/or implement the Shock Trauma discharge orders after Mr. Fishback's neck surgery, and after Mr. Fishback's November 2018 follow-up appointment.

61. Defendants DPSCS and Graham further breached their duty to Mr. Fishback when they caused his personal property to be removed from his cell without a proper inventory, which property was never returned to Mr. Fishback.

62. Each of these breaches caused permanent physical and emotional harm to Mr. Fishback, as described herein.

WHEREFORE, Plaintiff John W. Fishback, III demands judgment in his favor and against each Defendant in an amount greater than $75,000.00, as compensatory damages, costs, and such other and further relief as this Court deems appropriate.

## COUNT II
### Negligent Hiring, Training and Supervision
### (Against DPSCS, the State, and Graham)

63. The previous paragraphs are incorporated as if fully set forth herein.

64. At all relevant times, Defendant Graham was responsible for monitoring and overseeing all aspects of WCI, including the correctional staff, and was responsible for maintaining a lawful environment at WCI free from unreasonable risks to prisoners like Mr. Fishback.

65. At all relevant times, the State and DPSCS were responsible for monitoring and overseeing Defendant Graham, WCI, and the medical and correctional personnel at WCI, and was further responsible for ensuring that Defendant Graham implemented the governing statutes, regulations, policies and protocols, and institutional directives at WCI.

66. DPSCS, the State, and Defendant Graham each had a duty to use reasonable care in hiring, training, supervising, and retaining the correctional officers at WCI.

67. On information and belief, at all relevant times, DPSCS, the State, and Defendant Graham knew that protective measures, regulations, and protocols were not properly implemented at WCI, which created a safety and security risk to all prisoners and staff at WCI.

68. On information and belief, at all relevant times, DPSCS, the State, and Defendant Graham knew of, but ignored, the risk to prisoners caused by, *inter alia*, the lack of security cameras in housing units, failures to document maximum security prisoner movement, failures to search and secure prisoners before they left their housing units, and failures to implement medical follow-up orders as required by off-site doctors and hospitals.

69. Despite this knowledge, at all relevant times, DPSCS, the State, and Defendant Graham negligently trained, hired, retained, and/or supervised the correctional and medical staff at WCI.

70. The aforementioned failures caused harm to Mr. Fishback.

**WHEREFORE**, Plaintiff John W. Fishback, III demands judgment in his favor and against each Defendant in an amount greater than $75,000.00, as compensatory damages, costs, and such other and further relief as this Court deems appropriate.

Respectfully submitted,

_____
Allen E. Honick, AIS No.: 1612130266
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Seven Saint Paul Street, Suite 1500
Baltimore, Maryland 21202-1636
ahonick@wtplaw.com
(410) 659-6420
*Attorney for Plaintiff, John William Fishback, III*

## PRAYER FOR JURY TRIAL

Plaintiff, John W. Fishback, III, requests that this matter be tried before a jury.

Respectfully submitted,

_____
Allen E. Honick, AIS No.: 1612130266

*11917924*